## PEOPLE *v.* EATON.

1. CRIMINAL LAW—HOMICIDE—EVIDENCE—EXCLUSION OF EVIDENCE —HARMLESS ERROR.

> In a criminal prosecution of a father for manslaughter of his child, alleged to have been due to a course of ill treatment and to malnutrition by defendant and his second wife, where the defendant's mother had testified that at the time she became a member of the family, which was six or seven years before the child's death, the child was not strong and had a great deal of trouble with her stomach and vomited often, the exclusion of the answer to a further question as to what the child had eaten which made her sick was harmless error, where the witness was allowed to testify fully as to the child's condition at that time.

2. SAME—EVIDENCE—ADMISSIBILITY.

The admission of evidence of a neighbor as to hearing the
cries of a child being whipped in defendant's home was
proper, where the trial court stated that the testimony
would be stricken out unless it was connected with de-
fendant, that testimony as to what the mother did was
immaterial, that the charge was that the defendant by
his cruel conduct was responsible for the child's death and
that it would be idle to charge him with acts that were
committed by some one else.

3. SAME—EVIDENCE—EXPERT WITNESSES—HARMLESS ERROR.

Where an expert medical witness for the people stated on
cross-examination that the child did not have pyemia, the
exclusion of the answer to a further question as to how
pyemia manifested itself, although improper, was harmless
error, under the circumstances of the case, it not appear-
ing that there had been a miscarriage of justice.

Error to recorder's court of Detroit; Connolly, J.
Submitted April 13, 1917. (Docket No. 161.) De-
cided June 1, 1917.

Arthur B. Eaton was convicted of manslaughter and
sentenced to imprisonment for not less than six years
nor more than 15 years in the State prison at Jack-
son. Affirmed.

*Thomas Dalton,* for appellant.

*Alexander J. Groesbeck,* Attorney General, *Charles
H. Jasnowski,* Prosecuting Attorney, and *Harry B.
Keidan,* Assistant Prosecuting Attorney, for the
people.

KUHN, C. J. Respondent was convicted under an
information containing three counts charging him and
his second wife, Lottie C. Eaton, with the crime of
manslaughter. The defendant was born in Plainwell,
Mich., and prior to his removal with his family to De-
troit he had resided there, at Onaway and Three
Rivers. He had been married twice, and had two chil-

dren, Ethel and Sylvia, by his first wife, who died in 1908. He was married the second time in August, 1912, and came to Detroit to make his home in the spring of 1913. He lived on Perry street for a time, and in January, 1914, he moved to 895 Fisher avenue, where he resided at the time this complaint was made against him. It was the claim of the people that because of malnutrition and a course of ill-treatment the child Ethel was reduced to such a weak physical condition that in January, 1915, at the request of the Children's Aid Society, she was sent to Harper Hospital. Dr. Robert Moehlig, the house physician of the hospital, who made a physical examination of her the day after she was admitted, testified as to her condition as follows:

"She was in an extremely emaciated condition, with the skin drawn over her bones, with no subcutaneous fat. There were about three or four abscesses on her head. Her hair was very scanty, and there was a sore on the left ear. On the inside the right eye was discolored, red. The right eyelid was black and blue. The nose was bleeding. The two central upper teeth were broken off. She had a bruise on her neck on the right side. She had an abscess on her right and left shoulder and between the two scapulas. She had subcutaneous hemorrhages from the ensiform cartilage. She had an ascess on both hips. Her left arm was practically one abscess, and the index finger of the left hand was infected; she had an abscess on her right elbow, and there were two wounds on the interior surface of the tibia about six inches long. When she would cry out with pain, the skin of the face would go in folds, because there was no subcutaneous fat. By extremely emaciated I mean that the nutrition was very poor; that she had no fat at all, practically no fat. These marks on her legs were caused, I should judge, by a sharp instrument. They were cuts. By subcutaneous hemorrhages I mean beneath the skin. The abscesses I have described might have been caused by lying on a hard object, like a floor or bath tub. She remained in the hospital from January the 8th until

February the 28th. She was under my observation all of that time. There was a record kept of her condition every day by the nurses.

"*Q.* What was the matter with the girl?

"*A.* Malnutrition, starvation, that was the primary cause. There was an examination made of her blood by the Wassermann test. She was examined by myself, Dr. Haas, and Dr. Freund, and we pronounced her nontubercular."

She died on February 28th, and an autopsy was performed by Dr. Albert French, the county physician, who testified with reference thereto, as follows:

"I determined the cause of death to be from malnutrition. Malnutrition is due to insufficient assimilation and nutrition. The symptoms of malnutrition are loss of weight, anemia, extreme weakness and exhaustion. All these existed in this case. The appearance of the body was markedly emaciated. It was in a wasted condition with the skin pale, the skin drawn tightly over the bones, the ribs were easily seen. I would say that was from insufficient nourishment. The cheek bones were very prominent, due to lack of fat. The eyes were sunken. The size of the organs was below normal. I found no evidence of disease other than malnutrition or insufficient feeding. The mucous membranes had practically no color. In making a post mortem examination the body is opened, and all of the organs are gone over very carefully before they are taken out and examined separately. The post mortem agreed with the diagnosis at the hospital."

The assignments of error relate entirely to the rulings of the court on the admission and rejection of evidence. While the witness Abigail Eaton, the mother of the defendant, was upon the stand she was interrogated concerning the condition of the child while she was living with her immediately after the death of the defendant's first wife, and stated that at the time she was not a very strong child and had a great deal of trouble with her stomach and vomited often. The question was thereupon asked, "What was it she

had eaten that would make her sick?" and the answer was excluded. We are not of the opinion that the exclusion of the answer to this question could possibly have prejudiced the respondent. It occurred six or seven years before and the witness was allowed to testify fully as to her condition at that time.

The witness Catherine A. Sidney, who was a neighbor while the defendant lived on Fisher avenue, testified that she heard the cries of a child being whipped in the Eaton home, and the testimony was objected to because the people failed to connect the defendant with the ill treatment. With reference to this testimony the court, having previously stated that he would strike it out unless it was connected with the defendant, at its conclusion said:

"Part of it ought to stand, but there are some parts of the testimony with reference to what the mother did that this witness has given here that are entirely immaterial to this issue. The claim is made that the defendant by his cruel conduct, neglect, etc., is responsible, as I understand it, for the death of the child. It would be idle to charge him with acts that were committed by somebody else."

We therefore find no merit in this assignment of error.

Other assignments of error relate to the restriction of the cross-examination of Dr. Moehlig. He was asked whether or not in his opinion the girl had pyemia, and an attempt was made to interrogate him with reference to this disease. He was asked the question, "How does pyemia manifest itself?" and the answer was excluded. The doctor had stated that she did not have pyemia and that he had made an examination to determine that. The cross-examination of the physician, in our opinion, was improperly limited by the trial judge, and, having offered himself as an expert witness, full scope should have been given counsel

to test the accuracy of the knowledge and diagnosis of the witness, who had qualified as an expert. We cannot say, however, that under the circumstances of this case it was made to affirmatively appear that the limiting of the cross-examination of this witness resulted in a miscarriage of justice and therefore refuse to reverse the case on that ground.

An examination of the record shows that on the trial of this case the rights of the respondent were fully safeguarded by the learned trial judge. The conviction by the jury is therefore affirmed.

STONE, OSTRANDER, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. FELLOWS, J., did not sit.